```
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MISSOURI
                         SOUTHEASTERN DIVISION


UNITED STATES OF AMERICA,        )
                                 )
              Plaintiff,         )
                                 )
         v.                      )       No. 1:09 CR 130 SNLJ
                                 )                       DDN
MICHAEL JOE WELLS,               )
                                 )
              Defendant.         )
```

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

This action is before the court upon the pretrial motions of the parties, which were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b).

Defendant Michael Joe Wells has moved to suppress evidence (September 1, 2009; Doc. 38) and the United States has moved for a determination by the court of the admissibility or not of any arguably suppressible evidence (September 1, 2009).

An evidentiary hearing was held on October 1, 2009.[1] Thereafter, the parties filed post-hearing memoranda. From the evidence adduced at the evidentiary hearing, the court makes the following findings of fact and conclusions of law:

### FACTS

1. At approximately 4:00 a.m., on May 20, 2009, while Poplar Bluff Police Officer Shane Bates was on patrol, he received information from a confidential source (CS) concerning Michael Wells. Officer Bates was then acquainted with Wells, but only by name. CS told Bates that Wells was manufacturing methamphetamine in a shop building behind his house. CS said there was a hidden compartment built under work benches in the shop, and there was a paint can shaker that had been modified to hold a two-liter bottle for the "shake and bake" method of making methamphetamine. Officer Bates passed this information on to Detective Morgan; Officers Gerber and Akers were also given this information.

---

[1] A transcript of the hearing has been filed. (Doc. 51.)

2. Officer Bates drove past Wells's residence at 924 North Riverview in Poplar Bluff between 3:00 and 3:30 a.m., and again at 4:30 a.m. On the last occasion he saw that the door of a shed at the end of the driveway, and also to the rear of the residence, see Gov. Ex. 2, was open. The officer also saw that a street-side door of a camper truck, (Gov. Ex. 1), parked on the street in front of the residence, was also open. A street light illuminated the area.[2] When he had driven past the residence earlier that morning, those doors were not open. He saw no light on in either the shed or the vehicle. Because he thought these circumstances were unusual and could indicate that a burglary might be then occurring, and because of the information about the manufacturing of methamphetamine on these premises, he used his cell phone[3] to call in Poplar Bluff Patrolmen James Gerber[4] and Timothy Akers, for backup. After making the call, Officer Bates met Officers Gerber and Akers for a short time at a location not far from 924 North Riverview. They agreed to go to the residence to investigate a possible burglary, to investigate the possibility of methamphetamine making going on there, and to make contact with whoever was there in an investigative "knock and talk" procedure.[5] The dispatcher was advised of this plan by telephone call from the officers, not by a radio transmission. Then,

---

[2]Defendant Wells testified at the suppression hearing that the street light in the area was not operating that night. The undersigned credits the testimony of the officer over that of the defendant on this issue.

[3]Officer Bates used his cell phone to avoid detection by any perpetrators who might be using a scanner to monitor police radio communications.

[4]Officer Gerber was sufficiently trained and experienced in drug investigations to know that users of methamphetamine are unpredictable, can act nervously, be talkative and cooperative one minute, and can act offensively the next.

[5]In a "knock and talk" procedure the police approach a subject in an area where the public is entitled to be and initiate a lawful, consensual conversation relevant to criminal activity under investigation. In this case, before the officers conducted the knock and talk procedure, they did a security sweep of the shed and the recreational vehicle to assure themselves that there was no one else there who could pose a danger to them.

they all drove to the residence. (Def. Ex. N (audio recording of officer's telephone call to police dispatcher)); (Def. Ex. O (audio record of police radio traffic that does not mention "knock and talk" procedure)).

    3. When they arrived, the officers got out of their cars. Officers Akers and Gerber looked inside the camper vehicle[6] with the open door which was parked on the street in front of 924 to be sure no one was inside; the light was off and they found no one.

    4. A concrete driveway led approximately 25 feet from the street to a carport which extended from the left side[7] of the structure of the residence. An unpaved driveway, parallel to the concrete driveway led to the shed 135 feet from the street and approximately 85 feet to the rear of the residence. The shed had double garage-type doors which faced the street. (Gov. Exs. 2, 4; Def. Exs. B, H, Def. Schematic drawing of property at 924 North Riverview.) The premises of 924 were not fenced or gated on the front side, although they were fenced on the other three sides. All of the structures, including the shed, the residence, and the shop buildings were inside the fence. The shed was very near the property line fence on the left side of the property. There was no "No Trespassing" or "Keep Out" sign on the property.

    5. Officer Bates walked up to the shed and shined his flashlight through the open shed door and made sure there was no one in it. He then walked back to the side of the residence, (Gov. Ex. 4 and Def. Ex. B). When the other two officers joined him, all three saw a shop building, (Gov. Ex. 3), approximately 20 feet from the rear of the residence on the right side. (Def. Exs. D, E, F, and G). The shop's door, located on the left side of the shed near its front had a pane of frosted glass. Through the glass pane the officers saw a light and movement of some kind inside the shop. (Gov. Ex. 3; Def. Exs. E, G.)

---

[6]Defendant Wells testified at the hearing that the camper vehicle was not his but belonged to a neighbor.

[7]The court's use of "left side" and "right side" indicates the respective sides of the property or its structures as one faces the residence from North Riverview.

6. A concrete walkway extended from the shop door, around the front of the shop, and toward the right rear of the residence. A wood deck and stairs are attached to the residence side of the shop and extend toward the residence. (Gov. Ex. 3; Def. Exs. D, E, F, G.)

7. At that time Officer Bates stated that he did not want to be involved further in the investigation. So, Gerber and Akers went to the shop door, and Bates did not. Instead, Officer Bates took up a security position for the other officers.

8. At the shop door, Officer Gerber knocked on the door. In response to the knock, a man, later identified as Michael Joe Wells (also known as "Buster"), opened the door. Wells appeared to the officers to be very surprised to see them, as they stood there in uniform. As soon as the door was opened, the officers smelled a strong odor of burnt marijuana and they saw smoke in the air.[8] The officers also saw another man, later identified as Mr. Brummit,[9] inside the shop. Brummit also appeared surprised to see the officers. Officer Gerber directed both men to come out of the shop. Both men did so and were cooperative.

9. Officer Gerber made a quick security sweep of the shop to be sure no one else was inside. Inside the shop building, Gerber saw in a small office a large bag of what he knew was marijuana on an open surface next to the door.[10] Officer Gerber, in performing the protective sweep inside the shop, did not open any drawers, look in any tool boxes,

---

[8]Defendant Wells testified at the suppression hearing that the officer lied when he said there was an odor of marijuana and smoke there. Wells and Charles Brummit testified that there was no such odor or smoke. The undersigned credits the testimony of the officer on this issue. Defendant Wells has a prior federal felony conviction for manufacturing methamphetamine and he testified that the did not want to return to prison. Brummit is Wells's long time friend and would protect him from having to return to prison.

[9]Before this incident, the officers had no knowledge of Brummit and knew of someone named Michael Wells only as one suspected of methamphetamine manufacturing.

[10]Defendant Wells testified at the suppression hearing that the bag of marijuana was not in plain view for the officer to see; rather, the marijuana had been in a box. The undersigned credits the testimony of the officer on this issue.

or examine any such small space.[11] The protective sweep took no longer than a minute; no one else was found in the shop building.[12]

    10. Following Officer Gerber's observation of the bag of marijuana, the officers took Wells and Brummit's identifications. They then were arrested for the possession of the marijuana and handcuffed.

    11. Next, Officer Akers searched Wells's person and found, in his left chest pocket a coffee filter containing an amount of methamphetamine.

    12. One of the officers asked Wells whether he knew the shed door was open and he answered in the affirmative. Wells was also asked whether there was anyone else in the shop and he answered in the negative. Wells was taken from 924 to the police station.

    13. At the residence, the officers located Wells's wife and another woman. The police ran record checks on the women. (Def. Ex. O, compact disk, tracks 80-81).

    14. Later, Drug Task Force officers, including Poplar Bluff Officer Jason Morgan,[13] were called to Wells's residence. Officer Morgan entered the shop out of concern for the safety of the officers on the scene and of the general public, because the shop might contain hazardous materials involved in the manufacturing of methamphetamine. Officer Gerber also re-entered the office and pointed out the bag of marijuana to Officer Morgan. Officer Morgan obtained information from the other officers, including Officer Bates, about the investigation.

---

[11]Defendant Wells testified at the suppression hearing that the officer looked into drawers "and stuff." The undersigned credits the testimony of the officer over that of defendant on this issue.

[12]Mr. Wells was not asked and did not consent to any protective sweep by the police at his property on May 20, 2009.

[13]Officer Morgan had been trained in and had experience investigating methamphetamine trafficking. He knew specifically about the several processes of manufacturing methamphetamine and about the very hazardous dangers associated with the chemicals used in these processes.

With that information, he returned to the police department and prepared an application for a search warrant.[14]

15. In support of his search warrant application, Officer Morgan submitted his written, sworn affidavit to Missouri Circuit Judge John Bloodworth. The information included in the affidavit was only what he had learned from the other officers. It did not include information he learned first hand by entering the shop. Officer Morgan's affidavit stated that on May 20, 2009, Officer Gerber saw a motor home parked in front of 924 North Riverview with a door standing open, that Officer Gerber then conducted a search for burglary suspects, that he stated he went into the back yard of 924 and heard voices inside a shed, that he knocked on the shed door and was greeted by Michael Wells. Officer Gerber reported that he also then smelled the strong odor of burnt marijuana coming from inside the shed, and that Gerber saw marijuana in a bag inside the door of the shed on a shelf. The affidavit further stated that Gerber placed Wells and Charles Brummit, who was with Wells inside the shed, under arrest for possessing the marijuana; that a quantity of methamphetamine was found in a search of Wells's person. Further, Officer Morgan's affidavit stated that he had received information from a reliable anonymous source that Wells was making methamphetamine in a shed behind his residence at 924 North Riverview, using the "one pot" process that uses an electric paint can shaker and that the components for the manufacturing process are hidden under his work bench in the shed. The affidavit also stated that an identified supply company reported to the officer that Wells had bought quantities of "Liquid Fire (sulfuric acid) which is a meth precursor." The affidavit also stated that Officer Morgan went to 924 "prior to the application of the search warrant" and saw a described vehicle with the trunk lid open; that the trunk contained several grocery bags and inside of one were several boxes of kitchen matches the striker plates on which were composed of red phosphorus which is used in the manufacturing of methamphetamine. The affidavit also stated that on the property was a

---

[14]Defendant Wells testified that Officer Gerber had asked him for consent to search the residence without a warrant and that Wells refused to consent to this search.

vehicle belonging to Charles Brummit, a known methamphetamine manufacturer and user, and that Wells had a federal conviction for possession of methamphetamine in 2000 and was known to the police as a methamphetamine manufacturer. (Gov. Ex. 5 (Affidavit)).

16. At 7:47 a.m. on May 20, 2009, Judge Bloodworth issued a search warrant for "[t]he residence, vehicles and outbuildings located at 924 North Riverview in Poplar Bluff, Missouri" which authorized a search for "CONTROLLED SUBSTANCES, IMITATION CONTROLLED SUBSTANCES, DRUG PARAPHERNALIA, RECORDS AND/OR MONIES RELATED TO DRUG SALES AND MAIL." (Id. (Search Warrant)).

17. Thirty-four types of items were seized in the execution of the search warrant for 924 North Riverview.

## **DISCUSSION**

Defendant argues that the search of his person, the out-buildings on his property, and his residence were illegal. More specifically, he argues that illegally obtained information was put into the search warrant affidavit and that without the illegally obtained information, the affidavit did not provide probable cause for the issuance of the warrant.

### Initial entry

The officers arrived at 924 North Riverview at approximately 3:30 a.m. on May 20, 2009. First, they examined the interior of the camper vehicle with the open door that was parked on the public street. Defendant has abjured any standing on his part to complain about the officers' entry into the camper to look for evidence of a burglary. Minnesota v. Carter, 525 U.S. 88, 91 (1998)(without a reasonable expectation of privacy in a location there is no standing to complain of a police search of the location).

Nevertheless, although the officers had no search warrant, they acted lawfully under the Fourth Amendment, because exigent circumstances existed in the police observation of the open camper door and the open shed door. These circumstances gave the officers reasonable grounds to suspect a burglary had occurred or was then occurring. Thus, the police

acted reasonably under the Fourth Amendment, even if without a warrant, to further investigate their reasonable suspicions about a burglary. Zakrzewski v. McDonough, 455 F.3d 1254, 1260-61 (11th Cir. 2006) (per curiam)(reasonable to conclude that police warrantless entry was reasonable under the Fourth Amendment by facts indicating burglary).

The officers then entered the premises of 924. Defendant argues that the officers thereby entered the curtilage of the residence, including the area in which the shed and the shop buildings were located. Defendant argues that this area is covered by the Fourth Amendment. The Eighth Circuit has discussed the definition of curtilage under the Fourth Amendment:

> The Fourth Amendment protects a home and its curtilage – the area immediately surrounding a dwelling house – from unreasonable warrantless searches. However, this protection does not extend past the curtilage. Officers are permitted to enter a resident's property to observe buildings located outside the home's curtilage. The central component in deciding whether Gerard's garage was within the curtilage of his farmhouse is to determine whether the [garage] harbor[ed] the intimate activity associated with the sanctity of [Gerard's] home and the privacies of [his] life.
>
> We resolve curtilage questions with particular reference to four factors: the proximity of the garage to the farmhouse, whether the farmhouse and garage are within the same enclosure, the nature and uses of the garage, and the steps Gerard took to protect the garage from being seen by others. [E]very curtilage determination is distinctive and stands or falls on its own unique set of facts. Therefore, these factors are analytical tools used in determining whether Gerard's garage was so intimately tied to the farmhouse itself that it should be placed under the farmhouse's umbrella of Fourth Amendment protection.

United States v. Gerard, 362 F.3d 484, 487 (8th Cir. 2004)(internal citations and quotations omitted) (garage not within curtilage where record did not contain evidence of distance between farmhouse and garage other than they were generally close; garage did not lie inside fence surrounding farmhouse, although wooded vegetation surrounded both farmhouse and garage; garage separated from farmhouse by driveway; garage doors were locked, electricity was wired to the garage, and the garage windows were covered with plastic and cardboard; contents of the

garage were not visible; driveway led directly to the garage; no internal fences or signage prevented people from approaching garage; view of garage not blocked by members of public; and the odor of marijuana was allowed to escape from garage vents); United States v. Boyster, 436 F.3d 986, 991-92 (8th Cir. 2006).

In this case, the shed was not within the curtilage of the residence. The shed did not harbor the intimate activity associated with the sanctity of Wells's residence. While a concrete driveway led from the street to the carport extension of the structure of the residence, an unpaved driveway, parallel to the concrete driveway led to the shed which was 135 feet from the street and approximately 85 feet to the rear of the back of the residence. Although the shed is within the same fenced enclosure, it and its double garage-type doors were readily visible to the public from the street. And it was very close to the property's boundary fence.

Even if the shed was within the curtilage of the residence, the officer was not prevented by the Fourth Amendment from looking through its open door to investigate the suspicion of a burglary.

Having investigated the facts which reasonably indicated a possible burglary, the open doors of the camper vehicle and the shed, and found there was no further indication of a burglary, the officers nevertheless did not violate the limitations of the Fourth Amendment by going to the front door of the shop and knocking. Clearly, the shop is within the curtilage of the residence. The residence and the shop were approximately 20 feet apart. A concrete walkway led from the shop's door toward the residence. The upstairs wooden deck and the staircase from it faced the residence. These buildings were enclosed within the same fencing. The shop building was not as viewable by the public from the street as was the shed.

The officers, having their earlier tipster information about methamphetamine manufacturing on these premises, were within their rights and not in violation of the Fourth Amendment when they went to the shop door and knocked. They saw a light on in the shop and they saw movement. The location of the police was open to any member of the public who walked to the rear of the residence, down the unpaved roadway

that ran past the residence.  Walking up and knocking on the door with the hope of learning information through conversation with the occupant, a "knock and talk" procedure, was a consensual encounter that, even without a reasonable suspicion of illegal activity, did not violate the strictures of the Fourth Amendment.  <u>United States v. Spotted Elk</u>, 548 F.3d 641, 655 (8th Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1658 (Mar. 23, 2009).

When the occupants of the shop opened the door in response to the officer's knock, the officers immediately smelled a strong aroma of burnt marijuana and smoke in the air.  This information is "highly probative" of probable cause to believe the two occupants of the shop were then using marijuana, a criminal offense.  <u>Gerard</u>, 362 F.3d 484, 489 (8th Cir. 2004).  These facts corroborated the tipster's information that other drug law violation, methamphetamine manufacturing, was going on there.

With that probable cause, the officers could then lawfully arrest defendant and his companion without a warrant.  <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964).  With probable cause to arrest the two individuals who stood just outside the door of the shop, Officer Gerber was authorized to perform a protective sweep of the shop, for his safety and that of his fellow officers.  <u>Maryland v. Buie</u>, 494 U.S. 325, 337 (1990).  During this protective sweep, Officer Gerber did not open any drawers or examine any small spaces, and the search lasted no more than a minute.  His protective sweep complied with the command that such a sweep be "quick and limited to a cursory look at places where a person could be found."  <u>United States v. Williams</u>, 577 F.3d 878, 880 (8th Cir. 2009).

While conducting the protective sweep, Officer Gerber saw a large bag of marijuana, in plain view, on an open surface next to the door. Since Officer Gerber had a right to be in the shop and because the marijuana was in plain view and clearly incriminating, Gerber had a right to seize the marijuana without a warrant.  <u>Washington v. Chrisman</u>, 455 U.S. 1, 5-6 (1982).

After having arrested Wells, Officer Akers searched his person and found a coffee filter containing methamphetamine in his left chest

pocket. Akers lawfully seized the methamphetamine. Police officers are entitled to conduct a search incident to arrest, and to seize any weapons or evidence of crime. Chimel v. California, 395 U.S. 752, 763 (1969); United States v. Robinson, 414 U.S. 218, 236 (1973) (During a search incident to arrest, the officer was entitled to seize any "fruits, instrumentalities, or contraband probative of criminal conduct.").

By this time, the officers had lawfully smelled the burnt odor of marijuana emanating from the shop, lawfully found a large bag of marijuana in the shop, and lawfully seized methamphetamine from Wells's person. Officer Morgan detailed this information in his supporting affidavit. He also noted that a confidential source had stated that Wells was making methamphetamine in a shed at his residence, and that a supply company had reported that Wells had bought quantities of "Liquid Fire," a known methamphetamine precursor. Officer Morgan stated that he had seen a vehicle belonging to Charles Brummit on the property, and that Brummit was a known methamphetamine manufacturer. Finally, Officer Morgan stated that Wells had previously been convicted of possession of methamphetamine.

Looking to the totality of the circumstances, probable cause supported the issuance of the search warrant for Wells's property. See Illinois v. Gates, 462 U.S. 213, 238-39 (1983). In Caswell, the court found that a police officer's affidavit provided probable cause to support the issuance of a search warrant. Id. In that case, the affidavit described information received from a confidential informant, noted that the defendant had been seen buying five boxes of Sudafed (a methamphetamine precursor), and noted the defendant was found with methamphetamine on his person. United States v. Caswell, 436 F.3d 894, 899 (8th Cir. 2006).

Officer Morgan detailed similar information in his affidavit. In particular, Morgan noted that the officers had received reliable information from an confidential source, that Wells was seen buying methamphetamine precursors, and that officers had seized methamphetamine from Wells's person. Looking to Caswell, this information alone - to say nothing of the smell of burnt marijuana and the large bag of

marijuana - provided the issuing judge a substantial basis for finding probable cause for the issuance of the search warrant.

### Executing the Search Warrant

Based on the supporting affidavit, Judge Bloodworth issued the search warrant. The warrant authorized a search of "CONTROLLED SUBSTANCES, IMITATION CONTROLLED SUBSTANCES, DRUG PARAPHERNALIA, RECORDS AND/OR MONIES RELATED TO DRUG SALES AND MAIL," and authorized officers to search for these items on Walls's property. Gov. Ex. 5. Walls's property was defined as "[t]he residence, vehicles and outbuildings located at 924 North Riverview in Poplar Bluff, Missouri." Id.

In executing the warrant, the officers searched the office, file cabinets within the office, hidden shelves under work benches, a tool box, the kitchen, the living room, the bedroom, and dressers and closets within the bedroom. A search of these areas was authorized by the plain language of the warrant. See United States v. Crespo de Llano, 838 F.2d 1006, 1016 (9th Cir. 1987) ("Because the officers were in possession of a search warrant, they were authorized to search into all hidden places to find the cocaine."). In searching these areas, the officers seized thirty-four items.

Seizure of the items containing marijuana (Items #1, #31, #33) and marijuana seeds (Items #4, #29, #30, #34) were authorized by a search for "CONTROLLED SUBSTANCES." Seizure of the pseudoephedrine packages (Item #7), muriatic acid (Item #8), Coleman fuel (Items #13, #26), Iodized salt (Item #20), ammonia nitrate (#21), lithium batteries (Item #23), and liquid fire (Item #24) were authorized by a search for either "IMITATION CONTROLLED SUBSTANCES" or "DRUG PARAPHERNALIA." Seizure of the items containing sludge or liquid (Items #2, #17, #18, #19, #27), residue (Item #15), burnt residue (Item #3), methamphetamine residue (Items #5, #6, #28), powder residue (Item #32), and crystal substances (Items #25, #29) were also authorized by a search for either "IMITATION CONTROLLED SUBSTANCES" or "DRUG PARAPHERNALIA." Finally, seizure of the two-liter bottles (Items #9-#12), coffee filters (Items #14, #22), digital scales (Item #16), and marijuana pipe and paraphernalia (Items #30, #33) were authorized by a search for "DRUG PARAPHERNALIA."

See Schoonover v. Kansas, No. 07-3312-WEB, 2008 WL 4369306, at *5 (D. Kan. Sept. 23, 2008) ("The evidence shows Schoonover possessed coffee filters, anhydrous ammonia, Coleman fuel, canning jars, rock salt, muriatic acid, gas line antifreeze, lithium batteries, strainer, and ephedrine or pseudoephedrine. Schoonover possessed all the necessary materials to manufacture methamphetamine."). These items should not be suppressed.

### RECOMMENDATION

For the reasons stated above,

**IT IS HEREBY RECOMMENDED** that the motions of Michael Joe Wells to suppress evidence (September 1, 2009; Doc. 38) be denied. No physical evidence should be suppressed.

**IT IS FURTHER RECOMMENDED** that the motion of the government for the determination of the admissibility of arguably suppressible evidence (September 1, 2009) be denied as moot.

The parties are advised that they have until January 6, 2010, to file documentary objections to this Report and Recommendation. The failure to file timely documentary objections could result in the waiver of the right to appeal issues of fact.

　　　　　　　　　　　　　　　　/S/   David D. Noce
　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on December 15, 2009.