UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) | Case No. 1:09CR00130 SNLJ |
|  | ) |  |
| MICHAEL JOE WELLS, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

## ORDER

This matter is before the Court on defendant's Motion to Suppress Evidence, #94, relating to searches and seizures conducted on May 20, 2009, on premises owned by defendant. The government filed its response, #98, and defendant filed a reply thereto, #102. After a hearing, the Magistrate Judge filed a Supplemental Report and Recommendation, #113, incorporating his findings of fact from an earlier motion to suppress and making additional findings. Defendant then filed objections, #114, and after further briefing at the request of this Court, the matter is now ripe for consideration. The primary grounds for the motion are that the officers' entry onto defendant's property was unreasonable, and that the officers lacked probable cause to search the areas around defendant's home.

## Facts

In the early morning hours of May 20, 2009, while Poplar Bluff, Missouri, Police Officer Shane Bates was on patrol, he received information from an anonymous source concerning Michael Wells. Officer Bates was then acquainted with Wells, but only by name. The source told Bates that Wells was manufacturing methamphetamine in a shop building behind the house. The source said there was a hidden compartment built under work benches in the shop, and there

was a paint can shaker that had been modified to hold a two-liter bottle for the "shake and bake" method of making methamphetamine. Officer Bates passed this information on to Detective Morgan and Officers Gerber and Akers.

After receiving the tip, Officer Bates drove past Wells' residence at 924 North Riverview in Poplar Bluff "probably four" times, but he did not make note of the exact hour. On the last occasion, sometime between 3:00 and 3:30 a.m., he noticed that a street-side door was open on a camper vehicle parked in front of the residence, and he also saw that the doors were open to a shed located at the end of an unpaved driveway at the back of the property. These doors, Officer Bates testified, had not been open earlier. At that point, he thought these circumstances were unusual and could indicate that a burglary might be occurring, and because of the information about the manufacturing of methamphetamine of the premises, he made a cell-phone call to Officers Gerber and Akers requesting assistance. Without conducting any further investigation or surveillance, Officer Bates then left the area to meet the other officers at a different location on the "East Side." At the meeting, the officers agreed to go to the residence to investigate a possible burglary and to conduct a "knock and talk" procedure to investigate the methamphetamine tip. At 3:56.23 a.m., Officer Akers called police headquarters to report the plan. The entirety of that phone conversation is as follows:

Operator: City Police.

Akers: Me, Gerber and Bates are fixing to go do a knock-and-talk on Riverview, 924 North Riverview.

Operator: 924 Riverview?

Akers: Yes.

Operator: Alright. Thank you. Bye-bye.

Akers: Bye-bye.

The three officers then proceeded to 924 Riverview and arrived there at approximately 4:00 a.m.

When the officers arrived, Officers Akers and Gerber looked inside the camper vehicle with the open door which was parked on the street in front of 924 to be sure no one was inside; the light was off and they found no one. It was later determined that the vehicle belonged to a neighbor and that it had not been broken into.

A concrete driveway led approximately 25 feet from the street to a carport which extended from the left side of the structure of the residence as one faced the residence. A 12 to 14 feet wide unpaved driveway, parallel to and adjacent to the concrete driveway, led to the shed 135 feet from the street and approximately 85 feet to the rear of the residence. The shed had double garage-type doors which faced the street. The premises of 924 were not fenced or gated on the front side, but they were fenced on the other three sides. All of the structures, including the shed, the residence, and a two story shop building were inside the fence. The shed was very near the property line fence on the left side of the property. Photographs depicting the buildings and their layout are attached as Gov. Exs. 2, 3 and 4, and Def. Exs. B, E and H.

Officer Bates walked up to the shed and shined his flashlight through the open shed door and made sure there was no one in it. He then walked back to the side of the residence, (Gov. Ex. 4 and Def. Ex. B). When the other two officers joined him, all three saw the shop building (Gov. Ex. 3), approximately 20 feet from the rear of the residence on the right side. (Def. Exs. E and G). The shop's door, located on the left side of the shed near its front had a pane of frosted glass. Through the glass pane the officers saw a light and movement of some kind inside the

shop. (Gov. Ex. 3; Def. Ex. E.) A concrete walkway extended from the shop door, around the front of the shop, and toward the right rear of the residence. A wood deck and stairs are attached to the residence side of the shop and extend toward the residence. (Gov. Ex. 3; Def. Ex. E.)

At the shop door, Officer Gerber knocked on the door, and in response, a man, later identified as Michael Joe Wells (also known as "Buster"), opened the door. Wells appeared to the officers to be very surprised to see them, as they stood there in uniform. As soon as the door was opened, the officers smelled a strong odor of burnt marijuana and they saw smoke in the air. The officers also saw another man, later identified as Charles Brummit, inside the shop. Brummit also appeared surprised to see the officers. Officer Gerber directed both men to come out of the shop. Both men did so and were cooperative.

Officer Gerber made a quick security sweep of the shop to be sure no one else was inside. Inside the shop building, Gerber saw in a small office a large bag of what he knew was marijuana on an open surface next to the door. Officer Gerber, in performing the protective sweep inside the shop, did not open any drawers; look in any tool boxes, or examine any such small space. The protective sweep took no longer than a minute; no one else was found in the shop building. Following Officer Gerber's observation of the bag of marijuana, the officers took Wells and Brummit's identifications. They then were arrested for the possession of the marijuana and handcuffed. In addition, Officer Akers searched Wells' person and found, in his left chest pocket, a coffee filter containing an amount of methamphetamine.

Subsequently, the officers obtained a search warrant that they executed later that morning, and they seized 34 items from the shop as evidence of the manufacture of methamphetamine.

## Discussion

Defendant complains that the initial warrantless search and seizure as well as the subsequent search and seizure pursuant to the search warrant (which was based on the initial search and seizure) were in violation of the Fourth Amendment. Defendant maintains that the fruits of the searches and seizures should be suppressed because the officers' initial entry onto defendant's property was unlawful in that they did not have a search warrant or an arrest warrant or probable cause to make an arrest or to otherwise come on to the property where the out building/shop was located. In response, the government claims that the officers were justified in going on to the defendant's property because of the exigent circumstances presented by the possible burglary and that once they lawfully entered the property for that purpose and saw lights and persons moving within the shop building, they were justified in conducting the "knock and talk" procedure that then led to the arrests. The government adds that even if there were no exigent circumstances, the officers' entry on to the property via the unpaved driveway leading behind the main house was lawful because that part of the property was not within the curtilage of the residence and defendant had no reasonable expectation of privacy thereto.

This Court disagrees with the government on all points. The claim of exigent circumstances as an exception to the warrant requirement is simply too weak to pass constitutional muster. The alleged exigency is based solely on the officer's observation of an open door to a vehicle parked on the street in front of defendant's residence and an open door to a storage shed located on the far right corner of the property which gave rise to his concern that a burglary may have been in progress. Viewing the claim from the totality of the circumstances, this Court first notes that the perceived burglary did not involve the kind of exigency that

necessarily requires an immediate police response to save one from life or limb or from serious destruction or deprivation of his or her property. That is not to say that exigent circumstances do not exist where there is reasonable suspicion of a burglar or a prowler, but here it was more likely that the open doors were related instead to the drug manufacturing activity that was the officers real target. It is also a concern of the Court that the officer did not make an immediate inspection of the camper vehicle which was parked on the public street, at least to determine whether there was any sign of forced entry or other evidence of burglary so to corroborate his suspicions, and it appears that this limited investigation could have been done without any real threat to the officer's safety. But this Court's greatest concern with the claim of exigent circumstances is the fact that the officer left the scene of his surveillance for more than half an hour in order to plan a course of conduct with his fellow officers. If indeed the officer was pursuing a burglar or a prowler, it is inconceivable that the officer could be justified in leaving the scene during the very time that burglaries or other crimes were being committed. This belies any bona fide claim of exigency and leads to the conclusion that the claim was really a pretext to enter upon defendant's property to investigate the true object of the investigation, which was not a burglar or a prowler, but the manufacture of methamphetamine. *See, e.g., United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980) (no exigent circumstances existed where open door to mobile home merely suggested possible burglary).

In the absence of exigent circumstances, the government still maintains that the entry was lawful under the open fields doctrine and that defendant had no reasonable expectation of privacy to the officers' traverse along the unpaved roadway to the shed. This Court is of the opinion that had the officers legitimately gained access to the back yard area around the shed, their

observation of activity in the shop building at 4:00 a.m. would surely have given them lawful grounds for the knock and talk procedure. But the open fields doctrine does not apply in this case, and in any event, defendant had a protectable expectation of privacy in to the entirety of the property behind his residence, especially at 4:00 a.m.

This is not an open fields case because the backyard area was fenced in on three sides. In fact, some cases have found that a fenced in backyard is part of the curtilage of the residence. *See, e.g., United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997)(backyard of home, enclosed on three sides by wire fence, was part of curtilage); *United States v. Reilly*, 76 F.3d 1271, 1277-78 (2d Cir.)(defendant's property, enclosed by three-sided wire fence and woods, found to be curtilage), *aff'd. on reh'g,* 91 F.3d 331 (2d Cir. 1996). Furthermore, the backyard could not be viewed from the street, except for the narrow unpaved roadway adjacent to the concrete driveway that led to the storage shed in the back of the property. Neither the shop nor any part of the backyard was visible. In fact, the shop building itself is connected to the residence by a walkway and clearly is part of the curtilage. The government's contention that the existence of the unpaved driveway constituted a tacit invitation to the public to enter on the premises by way of the driveway is simply too great a stretch. To the extent that the general public, and the police, were tacitly invited to enter on the premises, the invitation extended, as in the case of most premises, solely to the front driveway and the front door of the residence. *See, e.g., United States v. Weston*, 443 F.3d 661, 655 (8th Cir. 2006 (lawful 'knock and talk' where officers restricted their movements to the driveway leading up to the front door of defendant's mobile home); *United States v. Anderson*, 552 F.2d 1296 (8th Cir. 1977)(ruling that officers lawfully performed 'knock and talk' at the back door only after unsuccessful 'knock and talk' at front

door).

For these reasons, this Court holds that the officers' initial entry on to defendant's premises and their subsequent searches and seizures were in violation of the Fourth Amendment. Therefore, the Motion to Suppress is **GRANTED**.

So ordered this 14th day of June, 2010.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE







